**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**TINA W.,[1]**

     **Plaintiff,**

**v.**                     **Case No. 3:23-CV-02690-NJR**

**COMMISSIONER OF SOCIAL
SECURITY,**

     **Defendant.**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Tina W. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, the Commissioner's decision is reversed and remanded for rehearing and reconsideration of the evidence.

### PROCEDURAL HISTORY

Plaintiff protectively applied for DIB and SSI in December 2017, alleging an onset disability date of December 23, 2014, which she later amended to January 1, 2017. (Tr. 14, 284-85; 288-91; 315). The application was initially denied on November 28, 2018 (Tr. 195-99), and it was denied upon reconsideration on February 21, 2019. (Tr. 202-09). Plaintiff timely requested a hearing, and Administrative Law Judge Robin J. Barber ("ALJ") held a hearing

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the accompanying Advisory Committee Notes.

on February 4, 2020. (Tr. 72-91; 210-17). Plaintiff and her attorney appeared at this hearing. (Tr. 72-91). The ALJ also held a supplemental telephonic hearing on July 11, 2022, at which Plaintiff, her attorney, and a vocational expert ("VE") appeared. (Tr. 42-71).

The ALJ issued an unfavorable decision on November 25, 2022, finding that Plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act, because she had the residual functional capacity ("RFC") to perform light work with several limitations, and she could perform jobs that exist in significant numbers in the national economy. (Tr. 14-33). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-7).

Plaintiff now appeals that decision directly to this Court, raising two issues: (1) whether the ALJ provided valid reasoning for finding Dr. Robinson's well supported opinion unpersuasive, and (2) whether the ALJ relied on her own lay opinion to interpret four years of physical treatment records and the resulting limitations. (Doc. 14). The Commissioner timely filed a brief in opposition to which Plaintiff filed a timely reply. (Docs. 20; 21).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The scope of review is limited and, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *Id.* Accordingly, this Court is not tasked with determining whether

Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal citations omitted).

In reviewing for substantial evidence, the entire administrative record is taken into consideration, but the reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination[.]" *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citations omitted). When an ALJ ignores an entire line of evidence contrary to the ruling, however, it becomes impossible for a district court to assess whether the ruling rests on substantial evidence. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Ignoring evidence in this way requires the district court to remand to the agency. *Golembiewski*, 322 F.3d at 917.

### DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for disability benefits, a claimant must be disabled within the meaning of the applicable statutes.[2]  Under the Social Security Act, a person is disabled if he or she

---

[2]  The statutes and regulations governing DIB and SSI are codified separately, but those relevant to this case are practically identical. Thus, except where otherwise appropriate, the Court will refer only to the regulations for disability benefits found at 20 C.F.R. §§ 404.1500-404.1599. The equivalent SSI regulations

has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for *any* consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)) (emphasis in original).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by medically acceptable diagnostic techniques. *See* 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that is both substantial and gainful and involves performing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

To render a decision after a Social Security hearing, an ALJ considers five questions in determining whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him or her unable to perform his or her past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national

---

may be found at 20 C.F.R. §§ 416.900-416.999. Moreover, the relevant statute for DIB is 42 U.S.C. § 423, and the relevant statute for SSI is 42 U.S.C. § 1382, 1382c.

economy? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Milhem v. Kijakazi,* 52 F.4th 688, 691 (7th Cir. 2022). Then the burden shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. While there are a substantial amount of physical and mental health records in evidence, the following summary is directed to the points raised by Plaintiff.

## I.   Relevant Medical Records

### a.   Mental Health

Struggling with intolerance, angry outbursts, emotionality, and low energy, Plaintiff sought mental health treatment in mid-2017 and underwent an adult diagnostic assessment. (Tr. 796-807). Shortly before the assessment, in an effort to protect her daughter, she chased her daughter's boyfriend with a knife resulting in her arrest. (Tr. 796). Plaintiff reported fears and paranoia of losing her mind, someone hurting her or her kids, and other "what if" worries. (*Id.*). Plaintiff labelled herself as a clean fanatic and described her sex life as risky. (*Id.*). She also detailed her traumatic life experiences

including physical and emotional abuse. (*Id.*). For example, Plaintiff had been shot at, choked unconscious, jumped out of windows, and experienced jumpiness at any unidentified noise. (*Id.*). She explained that she responded to others cruelly because she lacked patience and control over what she said. (Tr. 797). Plaintiff relayed that others do not want to be around her anymore. (*Id.*).

By the end of 2017, Plaintiff underwent another diagnostic assessment and received a diagnosis of post-traumatic stress disorder ("PTSD"), as a result of the sexual and physical abuse endured in her childhood and in past romantic relationships, and cannabis use disorder, due to her report of using 10 blunts a day. (Tr. 808-27). Her impulsive spending, social interaction symptoms, and struggle to control anger also indicated borderline personality disorder, but she did not exhibit enough symptoms for a determination to be made. (Tr. 817). She was enrolled in treatment but missed several appointments in early 2018. (Tr. 1296-1300). Plaintiff was making progress in treatment but lost her insurance and was discharged after not returning or responding to reengagement attempts. (Tr. 1293).

In September 2018, Plaintiff required crisis intervention after expressing homicidal ideation while completing registration paperwork at Centerstone of Illinois. (Tr. 1236-41). She returned to receive care a week later. (Tr. 1242-43). In a comprehensive assessment, she expressed thoughts about harming her daughter's boyfriend, and she was unsure if she could refrain from killing him. (Tr. 1242). Plaintiff explained that she reacted to anger by grabbing weapons. (*Id.*). Again, staff referred her for crisis intervention, but she was deemed safe to remain in the community after discussing a safety plan. (Tr. 1244).

Plaintiff returned the following month and received a comprehensive assessment. (Tr. 1252-55; 1258-67; 1268-75). She reported visual perceptual disturbances, ringing in her ears, contentious relationships with her adult children, struggles with listening to authority figures, and difficulty managing her anger, often resorting to violence with others. (Tr. 1258-59; 1263-64). She relayed a history of visual hallucinations and a pattern of involvement with abusive men. (Tr. 1259; 1264). Plaintiff also described poor personal care and crying spells. (Tr. 1263). She was diagnosed with generalized anxiety disorder, bipolar disorder, and major depressive disorder. (Tr. 1270, 1278).

At the end of 2018 and throughout 2019, Plaintiff attended some counseling sessions but missed several appointments and failed to return calls for continued care. (Tr. 1684-1700; 1751-68). While she remained interested in services, she claimed to face scheduling issues and transportation struggles. (Tr. 1751). Plaintiff was reassessed in July and September 2019. (Tr. 1708-50). Within these assessments, she reported sadness, crying spells, attention issues, excessive worry, fidgeting, nightmares, flashbacks of abuse, and trouble sitting still. (Tr. 1714-15; 1723-24).

In late 2019, a mental health professional at Chestnut Health conducted a new patient evaluation of Plaintiff. (Tr. 1793; 1799). Plaintiff sought treatment for anxiety, depression, and mood swings after her previous counselor left Centerstone. (*Id.*). Plaintiff described her triggers which included everyday life and people. (*Id.*). Plaintiff expressed that she constantly worries about all her children. (Tr. 1797). She reported that her mind relentlessly raced, she experienced perpetual paranoia and always felt on guard, and she had flashbacks of her past trauma paired with intrusive thoughts. (*Id.*). Just as before, she

tried to avoid people. (*Id*.). As to her physically and verbally aggressive behavior, Plaintiff said she would black out and go from zero to 10 with difficulty calming down. (*Id*.). Plaintiff characterized her sex life as somewhat reckless. (Tr. 1802). Plaintiff was diagnosed with schizoaffective disorder and PTSD. (Tr. 1797). As a result, she was restarted on Seroquel and Hydroxyzine. (Tr. 1795; 1798).

Her prescriptions for Seroquel and Hydroxyzine were increased after an appointment at Chestnut Health in February 2020. (Tr. 1955-59). In that visit, Plaintiff stated that her medications were helping and denied hallucinations. (Tr. 1955). She still used marijuana daily, but the amount reduced dramatically. (*Id*.). She was out of her medications for a couple months, but her provider restarted her on them in May 2020. (Tr. 1956; 1961-62; 1965). By June, Plaintiff again informed her providers of her difficulty calming down, depressed thoughts, excessive worry, racing mind, hypervigilance, and poor impulse control. (Tr. 1942-54). She also reported constant auditory hallucinations, including hearing voices. (Tr. 1944). The provider charted a diagnosis of schizoaffective disorder, depressive type, and PTSD. (Tr. 1947; 1949).

Again, her prescriptions were continued in both August and October 2020. (Tr. 1971; 1977). In her August visit, Plaintiff reported being out of her medications for a month. (Tr. 1967-72). She still experienced high anxiety and deep depression and listed her coping strategy as walking. (Tr. 1967). While her anger and irritability occurred "sometimes," she denied paranoia and hallucinations. (*Id*.). Her diagnosis remained the same. (Tr. 1971). In her October appointment, she reported improvement while on her medication, with less emotionality and reactivity along with lower depression and

anxiety. (Tr. 1973-78). At that time, her Seroquel was increased. (Tr. 1977).

Plaintiff also submitted to two relevant psychological evaluations—one in December 2016 and one in August 2018. Stephen Vincent, Ph.D., conducted the first evaluation, which lasted 44 minutes. (Tr. 718-21). Plaintiff reported a history of anxiety and depression, episodes of irritability with other people, sudden and unpredictable panic attacks, and stress in caring for her children and in social situations. (Tr. 718-19). Dr. Vincent categorized her thinking as negative, resulting in low positive emotionality with a tendency to be self-deprecating and find fault with herself. (Tr. 719). Plaintiff described herself as restless, fidgety, apprehensive, and tense. (*Id.*). Ultimately, Dr. Vincent found Plaintiff was not psychotic or suicidal, but his diagnostic impressions were mood disorder secondary to general medical conditions with major depression-like features, anxiety secondary to general medical conditions, and somatic symptom disorder with predominate pain in her upper and lower back. (Tr. 721).

In August 2018, Marva M. Robinson, Psy.D., evaluated Plaintiff after the Agency sent her for consultation. (Tr. 1219). During the half-hour visit, Plaintiff recounted several intermittent periods of treatment that helped her feel better at which point she would disengage. (Tr. 1220). She had recently resumed treatment after her aggravated assault arrest for threatening her daughter's boyfriend with a knife. (*Id.*). While guarded, Plaintiff opened up about her past suicide attempts and her efforts to process her history of domestic violence, including being raped by a family friend and the murder of her partner. (Tr. 1220-22). Plaintiff admitted to consumption of large amounts of marijuana to remain level. (Tr. 1221). She reluctantly endorsed auditory and tactile hallucinations.

(Tr. 1222). Plaintiff detailed that she consumed Benadryl to prevent things from crawling on her skin or in some instances resorted to a bleach bath. (*Id.*). She felt targeted by others, who were after her or aimed to demean her. (*Id.*). Plaintiff spoke of several specific incidents where she had been removed from social agencies after engaging in verbal and physical altercations with staff. (*Id.*).

Dr. Robinson noted Plaintiff's impairment in psychological processing and delusional thinking, along with poor immediate memory and fair fund of knowledge. (Tr. 1222-23). While her judgment in response to a hypothetical scenario was sound, the clinical interview indicated severe impairment in judgment when psychiatrically unstable. (Tr. 1223). In her ability to understand, remember, or apply information, Dr. Robinson believed Plaintiff had a mild limitation given past traumatic events. (*Id.*). Dr. Robinson assessed Plaintiff as having extreme limitations in interacting with others citing her removal from social agencies, strained familial relationships, and history of assaulting others. (*Id.*). As to the categories of concentration, persistence, or maintaining pace and adapting and managing oneself, Dr. Robinson levied marked limitations. (*Id.*). While acknowledging Plaintiff's ability to independently manage her activities of daily life, Dr. Robinson noted her tendency to go days without bathing, grooming, or leaving the house, her extreme depression, and her inability to effectively manage her emotions. (Tr. 1224).

After the assessment, Dr. Robinson diagnosed Plaintiff with major depressive disorder with psychotic features and PTSD with dissociative symptoms, rule out bipolar disorder. (*Id.*). Overall, Dr. Robinson concluded that to achieve improved functioning

Plaintiff required immediate and long-term psychiatric treatment. (*Id.*). Otherwise, according to Dr. Robinson, Plaintiff risked deterioration of her mental health. (*Id.*).

### b. Physical Health

Plaintiff endured ongoing issues with her back. In December 2014, Plaintiff was involved in a motor vehicle accident and experienced lower back pain as a result. (Tr. 531; 600-02; 673). A few months later, her injury was diagnosed as a compression fracture of the L1 vertebral body, which was healing well. (Tr. 532-35). Her x-rays at the time also confirmed lumbosacral degenerative disease. (Tr. 533). She continued to complain about back pain throughout 2015 and 2016. (Tr. 560-63; 609-18; 620-23; 628; 637-41; 648-51; 658-59; 684-87; 692-98; 876-80). In May 2016, Plaintiff received bilateral median branch nerve blocks and reported significant pain relief following the procedure. (Tr. 629; 708; 713-14; 849).

Two months later, Plaintiff received an x-ray of the lumbar spine that showed chronic compression deformity of superior endplate of L1 and moderate bilateral sacroiliac joint sclerosis. (Tr. 851; 865-66). Eventually, in October 2016, she sought follow-up treatment for the persisting back pain. (Tr. 707-11). Her x-ray at that time showed a healed L-1 compression fracture. (Tr. 712). An MRI revealed minimal disc bulging and minimal to mild bilateral facet degenerative change at L4-5 and L5-S1 but otherwise appeared normal. (Tr. 715-16).

In May 2017, Plaintiff established care with a new primary care physician. (Tr. 945-47). Apparently, her previous provider refused to treat her pain with medication or refer her to a pain specialist. (Tr. 946). Her new physician referred her for external pain management. (Tr. 947). The following October, Plaintiff visited the emergency room

complaining of chronic mid-thoracic and lower back pain due to more frequent standing and bending than usual. (Tr. 886-89). Her lower thoracic and lumbar spine were tender to the touch, but she had normal range of motion, no edema, and no sensory deficits. (Tr. 889). Upon discharge, her providers prescribed Vicodin and Flexeril for pain. (*Id.*). A week later, her follow-up examiner observed no back tenderness or swelling and a normal range of motion in Plaintiff's lower spine. (Tr. 937-940). As to her back pain, her examiner charted the possibility of drug-seeking behavior. (Tr. 940).

Plaintiff participated in physical therapy as part of her treatment. Notes from a physical therapy appointment in December 2017 show that Plaintiff reported chronic lumbar and thoracic pain that did not improve with medication. (Tr. 896-902). In that session, the physical therapist recorded tenderness to palpation, increased pain with range of motion, decreased flexibility in Plaintiff's hamstrings and hip flexors, weakness within her lower traps and bilateral hips, and poor lumbar stability, which led to pain and faulty movement patterns. (Tr. 889-90). The documentation from that session also indicates that Plaintiff could not tolerate prolonged standing, sitting, or activity because of pain. (*Id.*). Two days later, in an emergency room follow-up appointment, Plaintiff reported her recent lower back physical therapy but now complained of upper back pain. (Tr. 923-24). She exhibited decreased range of motion due to pain and received a muscle relaxer and Prednisone taper dose. (Tr. 924-25). While the plan was to participate in physical therapy twice a week for six weeks, she missed two appointments and was discharged. (Tr. 901-02; 922). She was referred to physical therapy again in January 2018, attended two more sessions then stopped. (Tr. 902-08; 912; 921; 1066-67; 1326-27).

Plaintiff continued to experience widespread and chronic pain. In March 2018, Plaintiff telephoned her primary care provider after noticing swelling in her legs from her knees to her thigh. (Tr. 1372). Staff advised her to visit the emergency room. (*Id*.). Once there, Plaintiff complained of muscle pain in the right arm and bilateral lower extremities over the last two days. (Tr. 1328). Her physical exam revealed a normal range of motion and no abnormalities. (Tr. 1331). The treating physician's assistant assessed muscle cramps and provided a potassium supplement. (Tr. 1332). A month later, Plaintiff requested an intermediate visit for pain medication, because pain management could not see her for a couple weeks. (Tr. 1368). But it was unclear what medication she wanted refilled as her current list did not include pain medication. (*Id*.).

Moving to October 2018, Plaintiff met with a medical provider to address back pain and hand pain. (Tr. 1352-56). The provider observed normal range of motion in the fingers and wrist, full grip strength, and no tenderness or swelling. (Tr. 1355). Her spine also exhibited no tenderness. (*Id*.). As instructed, within two weeks, she reported back as her left hand pain persisted. (Tr. 1352; 1356). She had full grip strength but reported weakened grip and knuckle pain. (Tr. 1352). While the x-rays were unremarkable, the physician suspected osteoarthritis and referred her to an orthopedist. (Tr. 1319-20; 1352; 1356). According to the treatment records, Plaintiff sought stronger pain medication until she could see a specialist and received a few Tramadol. (Tr. 1352). Her physician questioned whether she was potentially drug-seeking. (*Id*.).

Twice in 2019, Plaintiff received treatment for bilateral hand pain—once in January and once in July. (Tr. 1592; 1613; 1627; 1630-32). Her left hand was tender and had slightly

reduced muscle strength but full range of motion. (Tr. 1594). Plaintiff had full wrist strength but experienced pain with resisted motions. (Tr. 1615). She reported trying physical therapy, but her pain worsened. (Tr. 1613). In August 2019, a rheumatologist evaluated Plaintiff for her chronic pain. (Tr. 1661). The rheumatologist noted the unremarkable x-ray of her bilateral hands and wrists, her degenerative arthritis diagnosis, and her labs that returned a positive antinuclear antibody ("ANA") test result[3] but negative rheumatoid factor and inflammatory markers. (Tr. 1662). A physical exam revealed bony enlargement and mild tenderness in Plaintiff's finger joints. (Tr. 1665). She also exhibited no synovitis in her fingers or wrists, she had good handgrip strength, and had good range of motion in the shoulders. (*Id.*). After this examination, Plaintiff received a prescription for Prednisone. (Tr. 1667). The following month, Plaintiff visited an orthopedist reporting extreme pain in her hands, with the left worse than the right, occasional numbness, and joint swelling. (Tr. 2498). During the exam, she moved her hands slowly, but used full range of motion and showed no focal stiffness. (Tr. 2500).

Aside from her back and hands, Plaintiff's chronic pain also affected her bilateral legs, wrists, shoulders, elbows, and feet. At three separate visits in 2020, Plaintiff consulted with a rheumatologist. (Tr. 1823-60; 1869-82; 1885-904). The first visit resulted from a trip to the emergency room for pain in her hands, feet, and right lower back. (Tr. 1816-21). Again, Plaintiff reported widespread pain in her wrists, shoulders, hips,

---

[3] An antinuclear antibody is an antibody showing an affinity for nuclear antigens including DNA and found in the serum of a high proportion of patients with systemic lupus erythematosus, rheumatoid arthritis, and certain collagen diseases, and in some of their healthy relatives; as well as about one percent of otherwise healthy people. *Antinuclear Antibody (ANA)*, STEDMAN'S MEDICAL DICTIONARY, 47140, Westlaw (database updated Nov. 2014).

knees, feet, and back. (Tr. 1824). The examination revealed full range of motion with sacroiliac tenderness on the left side. (Tr. 1827). Plaintiff's x-ray of the right hip showed osteoarthritis in the hip joint with mild degenerative joint space loss and osteophyte formation. (Tr. 1828). An x-ray of her lumbar spine evinced no facet osteoarthritis or spondylolisthesis. (*Id.*). Imaging of her right knee and ankle returned normal results. (*Id.*). Plaintiff had a positive ANA test. (Tr. 1823-24). At the second and third visits months later, the rheumatologist also documented positive ANA results, with other labs turning up negative. (Tr. 1869; 1871; 1884). The x-rays of her hands and feet were negative. (Tr. 1863; 1888). Further imaging of her hips revealed bilateral symmetric sacroiliitis. (*Id.*). The rheumatologist prescribed Naproxen and ordered more imaging. (Tr. 1888).

Evidently, in August 2020, Plaintiff's pain spiked, which caused her to walk with a stick. (Tr. 1980). A recent MRI revealed active bilateral symmetric sacroiliitis, which could be seen with different types of inflammation and arthritis. (Tr. 1981). Further imaging and testing exposed sclerosis of both sacroiliac joints, most prominent at the anterior-inferior aspects of the joints, and elevated inflammatory markers. (*Id.*).

Her pain continued to become more intense towards the end of 2020 and into 2021. The affected areas included her spine, hips, feet, elbows, shoulders, and left hand. (Tr. 2000). While her pain marginally improved with nonsteroidal anti-inflammatory drugs ("NSAIDs"), her medical providers indicated she would likely need a biologic. (Tr. 2022). But insurance coverage posed a hurdle in acquiring such medication. (*Id.*). In a follow-up appointment with the rheumatologist in August 2021, Plaintiff received a prescription for Humira to address her polyarthralgia. (Tr. 2039-88; 2043). According to

Plaintiff, her pain worsened in her cervical and thoracic spine, elbows, pelvic area, knees, and feet and caused weakness in her hands. (Tr. 2039). Plaintiff reported that Humira spurred initial improvement, which wore off within weeks. (*Id.*). Duirng the physical exam, Plaintiff became tearful. (*Id.*). The next month, Plaintiff underwent more x-rays. (Tr. 1912-21). The x-rays indicated mild basal thumb osteoarthritis with a healed fracture on the right hand, a normal left hand, normal feet, and chronic L1 superior endplate deformity and multilevel mild lumbar degenerative changes. (Tr. 1912-13; 1920-21).

In November 2021, Plaintiff participated in a neurological exam, which showed good cervical range of motion, full strength in the extremities, and no tenderness in the neck or back. (Tr. 2094-95). In another rheumatologist follow-up visit, Plaintiff was assessed as having radiographic axial spondylarthritis, supported by stiffness in the hips and neck, and enthesitis of bilateral trochanters. (Tr. 2148-57). In the exam, she showed full strength and exhibited no appreciable sensory deficits. (Tr. 2152). Plaintiff saw some improvement with NSAIDs. (Tr. 2157). At this time, she also suffered from osteoarthritis and positive ANA. (*Id.*). Her provider ruled out lupus. (Tr. 1257).

In early 2022, Plaintiff received treatment for chronic pain in her upper and lower back, hands, and feet. (Tr. 2183; 2501-16). She experienced chronic paresthesia—an abnormal skin sensation, like tingling, burning, or prickling—in her hands and feet.[4] (Tr. 2184; 2335). Several diagnostic tests were performed on her hands and elbows, and x-rays and electromyography tests were ordered. (Tr. 2503-06). Her symptoms aligned

---

[4] A spontaneous abnormal, usually nonpainful, sensation (e.g., burning, pricking). *Paresthesia*, STEDMAN'S MEDICAL DICTIONARY, 653800, Westlaw (database updated Nov. 2014).

with mild carpal tunnel syndrome, and she received targeted bilateral injections and wrist braces for treatment. (Tr. 2506; 2511-12). She later received a Cimzia prescription. (Tr. 2188). Notes from a neurological exam documented decreased sensation in her lower right extremity and antalgic gait. (Tr. 2285-91). Plaintiff received further evaluation for knee pain, which noted crepitus and small joint effusions with minimal osteoarthritis. (Tr. 2515-16).

Her pain levels improved in May 2022, but she reported that activity exacerbated her pain. (Tr. 2335). Her medication at the time, Cimzia, improved pain and stiffness. (*Id.*; Tr. 2342). In May 2022, a physician's assistant observed that Plaintiff's bilateral foot and leg pain aligned with small fiber neuropathy and increased her nighttime Gabapentin dosage which mitigated Plaintiff's pain. (Tr. 2389; 2392).

Relevant to the ALJ's decision, Plaintiff underwent a consultative physical evaluation in November 2018. (Tr. 1229-31). Dr. Raymond Leung examined Plaintiff as she complained of arthritis in her back and a history of a compression fracture at L1, along with asthma symptoms like wheezing and shortness of breath. (Tr. 1229). She reported that previous injections and physical therapy did not help. (*Id.*). Plaintiff also disclosed that she smoked half a pack of cigarettes per day, reduced from multiple packs a day. (*Id.*). The examination revealed that Plaintiff had normal gait, she could walk 50 feet unassisted, and she could tandem walk and hop. (Tr. 1231). Plaintiff also successfully performed a heel walk, a toe walk, and a squat. (*Id.*). She demonstrated full range of motion of all joints, with no spasms. (*Id.*). Her straight leg raise bilaterally was positive with 4+/5 leg strength. (*Id.*). Dr. Leung assessed back pain with arthritis and a history of

a compression fracture and two bulged discs. (*Id.*). He also diagnosed asthma. (*Id.*).

## II.     State Agency Reviewers

On November 16, 2018, state agency review psychologist M.W. DiFonso, PsyD., provided an opinion after review of available evidence to date. (Tr. 124-25). Dr. DiFonso concluded that Plaintiff could handle multi-step productive activity with modified social demand. (Tr. 131). Dr. DiFonso also identified moderate limitations in ability to interact appropriately with the general public and accepting instructions and appropriately responding to criticism from supervisors. (*Id.*). Around the same time, state agency reviewing physician Charles Kenney, M.D., determined Plaintiff could sustain a range of light work given her physical limitations. (Tr. 133-34; 150-51).

On reconsideration, in February 2019, David Voss, Ph.D., affirmed moderate limitations in the same social interaction categories and added that Plaintiff had moderate limitations of "social expectations." (Tr. 168-69). As to her physical abilities, Dr. James Madison affirmed a range of light work upon reconsideration. (Tr. 166).

## III.    Evidentiary Hearing

### a.   Initial Hearing

Plaintiff appeared in person and was represented by counsel at an initial hearing on February 4, 2020. (Tr. 72-91). VE Delores Gonzalez was also present at the hearing but did not testify. (*Id.*).

Plaintiff testified that she believes she is disabled because she "can't get along with society" or "deal with people." (Tr. 76). She previously worked as a self-employed hairdresser specializing in braiding. (Tr. 76-77). Plaintiff reported that she can no longer

braid hair because she suffers from pain in her hands and arms, and because the long periods of standing create pain in her legs, feet, and back. (Tr. 77). Plaintiff's counsel informed the ALJ that Plaintiff is being treated for arthritis, degenerative disk disease of the lumbar spine, and gastritis. (*Id.*). The ALJ pressed Plaintiff about substance abuse, but Plaintiff denied any abuse of alcohol stating, "I drink occasionally. I don't binge drink. I've never binge drinked [sic]…I haven't drunk [sic] in a long time." (Tr. 78). She admitted to smoking marijuana and cigarettes. (*Id.*). But Plaintiff maintained that she has no money to afford either and only uses them when someone else provides them. (Tr. 81-82).

Plaintiff explained that she lives with three of her children—at that time, ages 7, 8, and 23. (Tr. 80). She testified that her oldest daughter helps with the younger children when Plaintiff is in pain and cannot get up. (Tr. 81). For example, Plaintiff's daughter helps get the other children to school and assists with household tasks like cooking, cleaning, and bathing. (*Id.*). The ALJ asked Plaintiff about her laundry, and Plaintiff stated that she goes to a laundromat, which is paid for by a friend. (Tr. 84). After this response, the ALJ asked Plaintiff about who her friends were that pay for the laundromat, cigarettes, and marijuana. (*Id.*). Plaintiff claimed the people helping her were neighbors and denied having friends or a support system. (Tr. 84-85).

As to her physical condition, Plaintiff reported that her back and leg pain prevent her from sitting or standing comfortably for more than a half hour. (Tr. 82-83). She also testified that she struggles to walk. (Tr. 83). After walking eight or nine steps from her house door to the car, Plaintiff described the feeling in her legs as "putty or rubbery." (*Id.*). Plaintiff stated that she has difficulty lifting or carrying things and that she struggles to open jars or grab a

gallon of milk without pain. (Tr. 86). At that time, Plaintiff was awaiting testing for lupus. (Tr. 87). She also explained that she could not mitigate her pain because several of the available medications upset her stomach and trigger her gastritis. (Tr. 86-87). Elaborating on her gastritis symptoms, Plaintiff stated that she suffers from daily stomach issues like vomiting, nausea, constipation, diarrhea, and gas. (Tr. 87).

Turning to her mental health, Plaintiff described that she prefers to be by herself, she does not get along with many people, she has daily suicidal and homicidal thoughts, and she struggles to focus. (Tr. 87-88). Plaintiff listed her daily activities as sitting in a daze, attempting to watch television, and trying to do things with her kids. (Tr. 88).

As a result of the hearing, the ALJ decided to send Plaintiff for x-rays of her lumbar spine, bilateral hands, and feet due to the lack of objective evidence to support Plaintiff's subjective complaints. (Tr. 88-91).

### b. Supplemental Hearing

Plaintiff appeared by telephone[5] and was represented by counsel at a supplemental hearing on July 11, 2022. (Tr. 42-71). VE Brenda Young also testified by telephone. (*Id.*).

At this hearing, Plaintiff updated the ALJ on many aspects of her life since the last hearing. Plaintiff reported that she lived in an apartment with her two youngest children (who were now nine and ten), one of her older daughters, and several grandchildren ages one to four. (Tr. 48-50). She testified that she frequents the laundromat once monthly,

---

[5] The ALJ's decision asserts that all participants attended this hearing via telephone (Tr. 14), but the transcript of the hearing explicitly states that the claimant appeared *in person* with her attorney and a VE also present. (Tr. 44). Within the transcript of the hearing, however, the ALJ makes clear that Plaintiff appeared by telephone. (Tr. 44; 47).

with six to eight bags of laundry, and also performs household chores like vacuuming, sweeping, dusting, and mopping. (Tr. 51-52, 56-57). Plaintiff claimed that she cooks once a week. (Tr. 51). Otherwise, she asserted that she buys microwave meals, fast food, and other meals that are easy to prepare. (*Id.*). She said she relies on her older daughter to go grocery shopping. (Tr. 52). Plaintiff asserted that she does not have an active driver's license as hers was suspended after a DUI in 2007. (Tr. 52-53). As a result, she gets around via bus, cab, and walking. (Tr. 53).

After discussing home life, the ALJ asked Plaintiff to describe her disability. (*Id.*). Plaintiff explained that her body hurts constantly, and she is sick and tired all the time. (*Id.*). She emphasized pain in her ankles, feet, legs, knees, arms, hands, neck, back, and pelvic area. (Tr. 53-56). She reported other symptoms including swelling, itching, and sores. (*Id.*). In terms of activities, Plaintiff described difficulty walking, sitting, standing, and maintaining energy. (Tr. 53). For example, Plaintiff explained that she could only walk or stand for a few minutes without needing to stop, at which point she feels lightheaded and close to passing out. (Tr. 54-56). For sitting, Plaintiff reported that after only a few minutes she must get up and stretch. (Tr. 56). She said her pain and symptoms had worsened since the initial hearing. (Tr. 55).

Along with her persistent physical ailments, Plaintiff claimed to suffer from mental health issues—for which she was receiving treatment—including bipolar disorder, PTSD, and anxiety. (Tr. 57-59). Again, she highlighted that she keeps to herself, she does not like people, and she cannot deal with society. (*Id.*). Plaintiff also reiterated her issues with concentrating, focusing, and staying on task. (Tr. 57-58). For example, she

explained that she could not sit down and watch an entire two-hour movie. (Tr. 58). She claimed to mainly stay in her home except for doctor appointments, picking up prescriptions, or going to the laundromat. (*Id*.).

Next, the ALJ and VE clarified some earning figures for the preceding years as well as Plaintiff's work history. (Tr. 59-62). The ALJ resumed questioning about substance use. (Tr. 63). Plaintiff reported that she was smoking two blunts of marijuana a day and had been smoking for about 16 years. (*Id*.). She also confirmed she smokes a pack of cigarettes daily but denied drinking alcohol other than "sociably." (Tr. 64). The ALJ also asked about Plaintiff's access to medication. (Tr. 63). Plaintiff recounted that she always retrieved and took her medicine unless she was without a doctor at a specific time. (Tr. 63-64).

Plaintiff was never a licensed beautician or cosmetologist but braided hair out of her house. (Tr. 66). Examining Plaintiff's work history and income records, the only work the ALJ could identify as full-time, per the regulations, was Plaintiff's hair braiding job. (*Id*.). As such, VE Brenda Young classified Plaintiff's past role as hair braiding with DOT code 739.684-017 presenting the closest match. (Tr. 67). Young stated there was no exact match for the type of hair braiding performed by Plaintiff, but the code relates to wigs and hairpieces. (*Id*.). Young also reported that, while the code is classified as sedentary work, Plaintiff's past role as performed would fall in the light work category. (*Id*.).

Young testified that an individual of Plaintiff's age, education, and work experience, who could perform light work, could occasionally climb ramps and scaffolds, and could frequently stoop, kneel, crouch, and crawl, would be able to perform Plaintiff's

past role of hair braiding. (Tr. 65; 67). According to Young, additional limitations—like avoiding concentrated exposure to extreme temperatures, vibration, and pulmonary irritants—make no difference in ability to perform the same hair braiding role. (Tr. 67-68). Young testified that the individual within this hypothetical could also perform the jobs of dining attendant, housekeeper, and retail clerk. (Tr. 68). When asked whether limiting fingering to frequent would change anything, Young replied no. (*Id.*). Young described that no more than one absence per month would be permitted with no more than seven or eight total absences in a year. (*Id.*). Young also reported that the roles would likely allow only 10 percent of time to be off-task. (Tr. 68-69). Switching the activity level to sedentary with all the same restrictions would include other jobs like order clerks, circuit board screener, and optical goods assembler. (Tr. 69).

## DECISION OF THE ALJ

In reaching her decision, the ALJ considered the hearing testimony from Plaintiff and the impartial vocational expert. She also considered Plaintiff's medical records and the evaluations of Charles Keeney, M.D., James Madison, M.D., M.W. DiFonso, Psy.D., David Voss, Ph.D., and Marva Robinson, Psy.D.

As a threshold requirement, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act for the relevant time. (Tr. 16). Next, at step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since December 23, 2014, the alleged onset date. (Tr. 17). At step two, the ALJ determined that Plaintiff's degenerative disc disease, sacroiliitis, osteoarthritis, residuals from a finger fracture in combination with carpal tunnel syndrome, depressive order, anxiety disorder,

and PTSD constituted severe impairments. (*Id.*). At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of one of the impairments listed in the regulations. (Tr. 18). At step four, the ALJ determined that Plaintiff had no past relevant work. (Tr. 31).

Finally, at step five, the ALJ concluded that Plaintiff had the RFC to perform light work with several limitations. (Tr. 21). Those limitations included: never climbing ropes but occasionally climbing ladders and scaffolds and frequently climbing ramps and stairs; frequently stooping, kneeling, crouching, and crawling; avoiding concentrated exposure to extreme temperatures, vibration, and pulmonary irritants; frequently fingering; understanding, remembering, and carrying out simple instructions; using judgment to make simple work-related decisions and adapting to occasional changes in a routine work setting; occasionally interacting with the public, including no adversarial-type activities (i.e., addressing customer complaints); and maintaining occasional interactions with co-workers with no tandem tasks. (Tr. 21-31).

The ALJ considered the evidence and found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 22). But the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*). Based on the testimony of the vocational expert, the ALJ concluded that, "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform." (Tr. 31-32).

Considering all the above, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from January 1, 2017 through the date of her decision. (Tr. 15, 32).

**DISCUSSION**

## I.  Did the ALJ provide sound reasoning for finding Dr. Robinson's opinion unpersuasive?

Plaintiff argues that the ALJ found Dr. Robinson's opinion unpersuasive for dubious reasons and failed to evaluate the supportability and consistency of the opinion. First, she asserts that the ALJ flatly rejected Dr. Robinson's thorough opinion assessing an extreme limitation in interacting and relating with others, a marked limitation in concentration, persistence and maintaining pace, and a marked limitation in adapting and managing herself. According to Plaintiff, the ALJ did so based on her own lay interpretation of the medical evidence rather than the medical evidence itself. For example, the ALJ discounted the extreme limitation in interacting with others because there was only one violent incident with Plaintiff pulling on knife on her daughter's boyfriend. Plaintiff also argues that the ALJ ignored other evidence supporting an extreme limitation like self-isolation, paranoia, impulsivity, cruelty, intolerance, impatience, and other kinds of physical and verbal aggression. Plaintiff urges that the ALJ needed to look at this entire combination of symptoms rather than simply homicidal ideation or a pattern of violence.

Second, Plaintiff criticizes the ALJ's reasoning in rejecting Dr. Robinson's conclusion that Plaintiff would have marked limitations in adapting and managing

Page 25 of 38

herself. According to Plaintiff, the ALJ mistakenly conflated her ability to remain stable during medical appointments and her ability to manage emotions in a work setting. Again, Plaintiff urges that the ALJ failed to evaluate the whole picture of her symptoms including her well-documented paranoia, homicidal and suicidal ideations, patterns of selecting abusive partners, poor decision-making skills, reckless sex life, and aggression. The ALJ faulted Plaintiff for lacking consistency in treatment and failing to keep up with her prescriptions, but Plaintiff argues this was actually a symptom of her mental illness that demonstrates her marked limitations in adapting and managing herself.

Third, Plaintiff challenges the ALJ's reliance on performance of activities of daily living, like taking care of children, as evidence against a marked limitation. In fact, Dr. Robinson concluded that Plaintiff had a marked limitation despite her ability to perform activities of daily living.

In Plaintiff's perspective, the ALJ used this same flawed reasoning in evaluating each of the state agency psychiatric reviewing opinions. Plaintiff also contends that the other state agency examiners used exceedingly vague analysis and terminology to classify Plaintiff's limitations. For instance, Dr. DiFonso said Plaintiff could engage in work activity with "modified social demand." Similarly, Dr. Voss stated that Plaintiff had a moderate limitation in "social expectations." Plaintiff avers that remand is warranted given these errors altogether.

In response, the Commissioner counters that the ALJ properly considered Plaintiff's reported conflicts with other people and her lack of social interaction alongside other evidence that Plaintiff interacted with neighbors, friends, her children, her grandchildren,

and medical providers. Moreover, the Commissioner states that it was appropriate for the ALJ to view the knife-wielding event as an isolated incident of violence.

The Commissioner asserts that the ALJ gave ample explanation as to why Dr. Robinson's assessment of marked and extreme limitations were not supported or consistent with other evidence in the record. For the marked limitation with ability to concentrate, persist, or maintain pace, the ALJ noted that Plaintiff only had issues with serial threes during her exam with Dr. Robinson and other exams showed no deficits in this category. As to ability to adapt and manage herself, the ALJ found no evidence of marked limitations because, while she demonstrated some impulsivity, Plaintiff was stable during exams, had no outbursts with treatment providers, had no documented issues of impaired grooming or hygiene, and cared for her family, cooked, shopped, and handled chores. Furthermore, the ALJ emphasized a lack of hospitalization for mental health concerns. According to the Commissioner, all of this evidence from the record was inconsistent with marked and extreme functional limitations. The Commissioner asserts that, while Plaintiff clearly disagrees with the ALJ's factual analysis, she fails to point to any evidence that undermines the ALJ's evaluation of Dr. Robinson's report.

As to the other state agency examiners, the Commissioner similarly states that the ALJ's consideration of their administrative medical findings was appropriate and consistent with the regulations. According to the Commissioner, the ALJ provided sound reasoning as to the persuasiveness of these administrative findings. Namely, the ALJ explained that the moderate limitation in interacting with others was consistent with the medical record which includes reports of difficulties with conflict, anger, and social

isolation paired with appropriate behavior in medical visits and reports of spending time with others. The Commissioner highlights that the ALJ imposed more restrictive limitations than Dr. DiFonso and Dr. Voss regarding Plaintiff's ability to adapt and manage herself—moderate as opposed to mild.

After review of the record and the ALJ's decision, the Court agrees with Plaintiff. To the Commissioner's point and the ALJ's credit, the ALJ obviously reviewed the extensive mental and physical health records thoroughly within her decision. The ALJ discounted the opinion of Dr. Robinson—the only examining mental health professional that the Agency sent Plaintiff to see for evaluation—in favor the non-examining reviewers. Doing so can be permissible. But in her analysis, the ALJ significantly glossed over relevant and contrary mental health evidence in deciding to reject Dr. Robinson's consultative medical opinion.

Generally, per the relevant regulations, "[a] medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder." 20 C.F.R. § 416.920c(c)(3)(v). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In evaluating medical opinions, an ALJ may consider various factors, but must consider two: supportability (the explanation and support the source provides for its opinion) and consistency (how consistent the opinion is with other evidence in the record). 20 C.F.R. § 404.1520c(b)(2), (c)(1)-(2). Of course, a minimal articulation by the ALJ of her justification for rejecting or accepting

specific evidence of a disability is sufficient, so long as the ALJ considers the regulatory factors and builds an accurate and logical bridge between the evidence and her conclusion. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *see Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021).

In addition, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). And an ALJ cannot cherry-pick records from Plaintiff's "good days," ignoring her bad days and how those symptoms would limit her ability to work. *See Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012) ("[Plaintiff's] RFC should not have been measured exclusively by her best days; when a patient like [Plaintiff] is only unpredictably able to function in a normal work environment"); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (ALJ must consider whether one who suffers good and bad days could hold a job).

From her assessments dating back to 2017 through her most recent mental health records from 2020, Plaintiff clearly suffers with several mental health issues that manifest in anger, paranoia, impulsivity, hallucinations, and many other symptoms. Plaintiff has been diagnosed with generalized anxiety disorder, bipolar disorder, major depressive disorder, PTSD, and schizoaffective disorder (which was diagnosed after Dr. Robinson evaluated Plaintiff). As recounted above, Plaintiff has experienced auditory and visual hallucinations, she has tendencies to isolate at home for weeks at a time, and she resorts to verbally and physically abusive behavior when dealing with others. She also has a

history of trauma along with suicidal and homicidal ideation. The most noteworthy incident is the one that spurred her to seek treatment in 2017—pulling a knife on her daughter's boyfriend that resulted in arrest for aggravated assault. The record also shows the persistence of her homicidal ideation as Plaintiff twice required crisis intervention over a year later after expressing thoughts of killing the same boyfriend while filling out intake paperwork. Moreover, she self-medicates with copious amounts of marijuana to stay "level." And in 2019 and 2020, she had a prescription for Seroquel, an antipsychotic medication, and the dosage was eventually increased after further assessment.

In her decision to discount Dr. Robinson's opinion, the ALJ primarily criticizes Dr. Robinson's reliance on Plaintiff's subjective complaints and self-reported history and symptoms. As the Seventh Circuit has stated, it is "illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms." *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016). Often objective medical evidence is not available to support mental health diagnoses. *Id.* ("But a psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning; there is no blood test for bipolar disorder."). Moreover, "[m]ental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019); *but see Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022) (permissible for ALJ to discount a physician's opinion based primarily on subjective complaints as to *physical* health symptoms). An ALJ's decision to discount a mental health opinion can be

reasonable when there is no indication the mental health professional used their objective lens of professional expertise in evaluating the subjective reports and complaints. *Behlman v. Saul*, No. 19-C-1147, 2020 WL 6889187, at *5 (E.D. Wis. Nov. 24, 2020).

Here, the ALJ does not indicate that Dr. Robinson did not apply her professional expertise to evaluate Plaintiff's subjective complaints. Instead, the ALJ attempts to explain that the remainder of the medical evidence showed few "objective findings" of abnormalities in mental status exams, no conflicts with treatment providers, normal attention, and no evidence of impaired grooming to discount Dr. Robinson's reliance on subjective and historical complaints. Dr. Robinson's opinion, along with treatment notes throughout the course of Plaintiff's mental healthcare, can also amount to "objective support" when Plaintiff's self-reported symptoms are filtered through their lenses of professional expertise. Each mental health professional diagnosed Plaintiff with similar mental health disorders over several years, with providers eventually identifying a diagnosis of schizoaffective disorder and prescribing an antipsychotic medication.

While the ALJ primarily rejects Dr. Robinson's opinion for relying too heavily on subjective and historical complaints, the ALJ's reasoning appears to mostly ignore Plaintiff's history and reported symptoms. Instead, the ALJ relies on Plaintiff's presentation during her medical examinations, her ability to handle activities of daily living (which is also based on subjective self-reporting), and her lack of hospitalizations in determining that Dr. Robinson's opinion is not supportable. Courts have taken issue with equating each one of these categories with an ability to work. *See Crump v. Saul*, 932 F.3d 567, 571 (7th Cir. 2019) (explaining that the doctor's office and a structured, relatively

short mental health examination are "an altogether different environment than a full day at a competitive workplace with sustained demands."); *see also Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) ("We have previously cautioned ALJs that there are critical differences between keeping up with activities of daily living and holding down a full-time job."); *Adams v. Berryhill,* No. 17 cv 47, 2017 WL 4349718, at *12 (N.D. Ind. Oct. 2, 2017) ("While inpatient hospitalization can be indicative of serious mental health symptoms, a lack of hospitalization does not necessarily mean that the individual's symptoms are not disabling."). In fact, Dr. Robinson also assessed that Plaintiff had the ability to manage activities of daily living independently but cited several reasons for still imposing a marked limitation. In addition, the ALJ misstates some of Plaintiff's reported activities of daily living as Plaintiff testified she only cooks once a week for her children otherwise resorting to microwave meals or fast food, and her older daughter does the grocery shopping and helps with the younger children when Plaintiff cannot get out of bed.

Moreover, the Court finds that the ALJ's consistency analysis is selective. The ALJ glosses over prior past conflicts with others by stating she had no ongoing physical confrontations documented during the relevant time outside the incident of aggravated assault. But this ignores the fact that her homicidal ideation towards that individual continued for a least a year based on the records in evidence. The ALJ also asserts that she was able to interact with neighbors and friends, children and grandchildren, and treatment providers. But there were many documented reports of Plaintiff struggling to get along with her adult children and her family, along with her history of engaging in

abusive relationships. In addition, she stated that she primarily stays at home and does not go out or interact with many people at all. Plaintiff also identified several different workers to Dr. Robinson with whom she had conflict at social agencies. And she was removed from those agencies due to verbal and physical altercations. In her analysis of Dr. Robinson's opinion, the ALJ also does not mention Plaintiff's symptoms of paranoia, auditory and tactile hallucinations, history of suicidal ideation, her aggression that caused her to "black out," her depression, and her self-isolation. In terms of adapting and managing herself, the ALJ acknowledges that Plaintiff had some difficulties with impulsivity, but appeared stable during exams and had no outbursts with treatment providers, no impaired grooming or hygiene, and could cook, shop, and perform household chores. The ALJ did not address Plaintiff's lack of engagement in her treatment as a possible symptom of her mental illness that displays reduced capacity to adapt and manage herself.

Certainly, the undersigned acknowledges the very deferential standard afforded to an ALJ's decision and the limited role a reviewing court has. *See Crowell v. Kijakazi*, 72 F.4th 810, 816 (7th Cir. 2023) (explaining the very deferential standard afforded to an ALJ's decision so long as the ALJ properly considers the regulatory factors and minimally articulates their rationale). Moreover, the Court agrees with the Commissioner that the ALJ minimally articulated her reasons for rejecting Dr. Robinson's opinion. But in the complicated space of mental health, the Court finds that the ALJ's consistency and supportability analysis was not logical and ignored key contrary evidence necessary to build a logical bridge. She rejected Dr. Robinson's psychological opinion because it was

rooted in subjective complaints—this is illogical. And while the ALJ offered reasons for rejecting Dr. Robinson's opinion, the Court is hesitant to find that those reasons— minimal activities of daily living, lack of hospitalizations, and cooperation during medical examinations—logically connect to her decision to entirely disregard an examiner's opinion based on subjective complaints and self-reports. The Court finds the inverse notion troubling—that a person must be unkempt, disruptive with medical providers, and maintain a pattern of ongoing violence for their mental conditions to be markedly or extremely limiting or disabling. The ALJ did not consider Dr. Robinson's or any other mental health providers' lens of professional expertise and instead considered the recorded symptoms merely subjective. Admittedly, this is a nuance in the mental health space, but it is an important one. The ALJ erred in evaluating Dr. Robinson's opinion.

## II.  Did the ALJ's physical RFC impermissibly rely on her lay interpretation of four years of medical evidence?

Turning to physical health, the most recent medical opinion in evidence is dated February 2019. Given that the ALJ issued her decision in 2022, four years of medical records are in evidence without an associated medical source opinion. Plaintiff argues that the ALJ's reliance on the 2019 opinion, despite four years having passed, led to a physical health determination that was based on her lay interpretation of the newer medical records rather than on medical opinion evidence. According to Plaintiff, this warrants remand.

Plaintiff avers that the newer records substantially change the medical picture.

Particularly, Plaintiff calls attention to her rheumatology treatment that started in August 2019—after the last available medical opinion—and continued through 2022. She sought treatment for widespread chronic pain, and objective testing showed a positive ANA result and, in other testing, an elevated inflammatory marker. She also required biologic medications to treat the pain. Plaintiff argues that this medical evidence corresponds with an autoimmune condition not an orthopedic condition. She criticizes the ALJ for using the minimal orthopedic findings in the record to posit Plaintiff was drug seeking or malingering. Plaintiff also challenges the lack of state agency medical opinions for the complex rheumatology records after 2019 that eventually forced the ALJ to interpret the functional effects of Plaintiff's conditions.

On the contrary, the Commissioner argues that, though Plaintiff disagrees with the ALJ's assessment, there was no reversible error. As to Plaintiff's arguments that the most recent medical opinion was from 2019, the Commissioner emphasizes that Plaintiff carries the burden to establish her disability. The Commissioner also asserts that the regulations empower the ALJ to make a legal finding as to Plaintiff's work abilities and doing so does not constitute a lay interpretation. In response to Plaintiff's arguments regarding the more recent records of her arthritis, the Commissioner avers that the ALJ thoroughly reviewed and referenced the medical records related to her arthritis. Ultimately, the Commissioner argues that Plaintiff asks this Court to impermissibly reweigh the evidence. According to the Commissioner, the ALJ sensibly analyzed the wealth of relevant evidence to assess Plaintiff's work abilities and rendered a decision supported by substantial evidence.

After review of the physical health records, the Court agrees with Plaintiff. After the initial medical source opinion from early 2019, Plaintiff visited with a rheumatologist and several other medical providers. The medical records indicate that, unsurprisingly and consistent with the prior evidence relied upon by the ALJ, x-rays were unremarkable. But her labs showed a positive ANA test result, which can indicate an autoimmune disease. This positive ANA marker was noted in several of her medical documents. A later MRI revealed active bilateral symmetric sacroiliitis, which could be seen with different types of inflammation and arthritis. And further imaging and testing exposed sclerosis of both sacroiliac joints and elevated inflammatory markers. Her medical providers in 2020 and 2021 decided that she required a biologic medication, and in 2021, she started Humira to address her polyarthralgia. Moreover, she later received a Cimzia prescription. In May 2022, one provider remarked that her bilateral food and leg pain aligned with small fiber neuropathy.

Of course, the ALJ and this Court are not physicians, and as such, cannot determine what, if anything, these results effectively mean for Plaintiff's diagnosis and resulting physical abilities. But the Court agrees with Plaintiff that the ANA marker, rheumatology findings, and MRI results change the medical landscape of Plaintiff's case and possibly shed light on the inconsistencies between the orthopedic findings of full strength and range of motion and her longstanding reports of chronic pain. And, "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *see also Stage v. Colvin*,

812 F.3d 1121, 1125 (7th Cir. 2016) (finding that new medical evidence "changed the picture so much" that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician). Despite the Commissioner's claims that Plaintiff carries the burden to show disability, the ALJ can submit MRIs and other medical records for medical scrutiny and should do so when "new and potentially decisive medical evidence" becomes available. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). Not doing so can amount to a "critical failure." *Id.* at 682.

Here, Dr. Kenney's and Dr. Voss's assessments could have been reasonably affected by this new evidence discovered through rheumatology examinations, new lab work, success with biologic medication, and additional MRIs. The possible presence of an autoimmune condition could significantly change the interpretation of the other medical evidence in the record. As Plaintiff's medical landscape changed in light of these new results, the ALJ should have submitted this new evidence for medical review and opinion to inform her decision.

## Conclusion

Accordingly, the Court finds that the ALJ's decision in these two aspects were not supported by substantial evidence. The Court wishes to stress that this Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

But in accordance with the discussion above, the Commissioner's final decision

denying Plaintiff's application for social security disability benefits is **REVERSED** and

**REMANDED** to the Commissioner for rehearing and reconsideration of the evidence,

pursuant to sentence four of 42 U.S.C. §405(g). The Clerk of Court is **DIRECTED** to enter

judgment in favor of Plaintiff.

      **IT IS SO ORDERED.**

      **DATED:   September 26, 2024**

                                                  **NANCY J. ROSENSTENGEL**
                                                  **Chief U.S. District Judge**